869 So.2d 169 (2004)
Daniel J. DAMRILL and Calvin Kirkland
v.
IMINORITIES. COM., INC.
No. 2003-CA-0739.
Court of Appeal of Louisiana, Fourth Circuit.
February 18, 2004.
*170 Gregory A. Dupuy, Clarence O. Dupuy, Jr., Dupuy & Dupuy, Metairie, LA, For Plaintiffs/Appellants.
Rosa H. Edwards, New Orleans, LA, For Defendant/Appellee.
(Court composed of Judge JAMES F. McKAY III, Judge MICHAEL E. KIRBY, Judge Pro Tempore MOON LANDRIEU).
MICHAEL E. KIRBY, Judge.
Daniel J. Damrill and Calvin Kirkland, sue their former employer, Iminorities.com, *171 Inc., to enforce wage claims, specifically defendant's denial of bonus and severance pay, as well as, meal and travel reimbursement expenses after termination of employment. The trial court ruled in favor of defendant and denied all claims with the exception of Mr. Kirkland's claim for reimbursement of meal expenses. We reverse on several claims and affirm the remainder.

STATEMENT OF THE FACTS
Plaintiffs allege that in seeking to employ the plaintiffs, Iminorities worked upon the assumption it could secure a second round of financing by acquiring equity investors through a venture capital group. Iminorities' Business Plan projected the company as becoming an electronic start-up company with potential to generate an Initial Price Offering (IPO) that would take it public. For whatever reason, this capital never arrived and Iminorities experienced a cash shortage. In an attempt to slow their cash burn rate,[1] Mr. Preston Edwards Sr., Chief Executive Officer, cut salaries, laid off personnel, and implemented other cost cutting measures. Iminorities presented nothing to dispute its cash problem in early 2001.
On August 14, 2000, Mr. Damrill began his employment with defendant pursuant to an offer letter from defendant that stated that he "will report to John Isett, Chief Technology Officer." The offer letter established his title as Senior Web Developer. Defendant's bonus package offer to Mr. Damrill stated:
You will participate in the company's bonus plan. Your targeted bonus is 20% of your salary (prorated for the year 2000). Bonus targets will be based on the objectives developed by you and your manager. The 2000 bonus will be payable during the first quarter of 2001. The bonus payment is contingent upon your being employed with iMinorities.com, Inc. at the time of payment and that your performance has been satisfactory.
Dr. John Isett was the Chief Information Technology Officer of Iminorities and Mr. Damrill's supervisor for all of the year 2000 and for most of his employment in the year 2001. Dr. Isett established goals for Mr. Damrill and referred to Damrill's performance in very complimentary terms while plaintiff was employed by Iminorities. Dr. Isett informed the defendant and Mr. Edwards, Sr., that Mr. Damrill had earned and was due his bonus for the year 2000. In March of 2001, Dr. Isett was laid off.
Although Iminorities did not have the money to hire another Ph.D., it did hire Mr. David Cook to replace Dr. Isett. His testimony is discussed below.
On May 11, 2001, Mr. Damrill resigned from Iminorities, and attempted to collect his bonus for the year 2000. Mr. Edwards, Sr., contacted Dr. Isett and requested a written document specifying Mr. Damrill's employment goals and his accomplishments. Despite the fact Dr. Isett was no longer employed by the defendant, he complied with the request, and provided a written document describing Mr. Damrill's goals and accomplishments which Dr. Isett believed entitled him to his bonus for the year 2000.
Nevertheless, the defendant refused to pay the bonus, alleging that he did not perform well. Plaintiff sues for payment under the terms of the bonus package *172 quoted supra, specifically a prorated bonus for the fiscal year 2000.
Mr. Calvin Kirkland began his employment with defendant as the Vice-President of Sales Operations on or about June 29, 2000. Mr. Kirkland was highly sought after by Iminorities because he was a seasoned veteran in start-up operations, sales and the high technology world. Mr. Kirkland had worked for companies such as Xerox and the world's largest Executive Search firm. Iminorities negotiated with Mr. Kirkland resulting in a revision of its initial offer. The revised offer is dated June 27, 2000 and stated the following in regards to remuneration:
Your base salary will be $4,615.38 per pay period (if annualized $120,000). You will be paid every other Thursday and will be paid twenty-six pay periods per year.
In addition to your base salary you will be eligible for a bonus up to 60% of your base salary for attaining specific operating objectives. The primary objectives are developing the sales infrastructure and achieving the annual revenue goal.
You will be given 100,000 shares of Iminorities.com, Inc. common shares valued at $.45 per share.
[Emphasis added.]
Sometime after Dr. Isett was released, Mr. Kirkland was fired for cause. The reason given was his alleged "repeated failure to perform the material duties of [his] job in accordance with the company's policies and standards." As per the contract, by firing the plaintiff for cause, Iminorities claimed it did not owe Mr. Kirkland severance pay.
Mr. Kirkland seeks the stock he was granted in his contract and categorically denies there was any "cause" for his firing other than the need to cut payroll as financing had not been secured. Therefore, he also seeks severance pay.

STATEMENT OF THE LAW
The appellate court reviews factual findings for manifest error, or clear wrongness. Rosell v. ESCO, 549 So.2d 840 (La. 1989). Nevertheless, as we recently held in Cadogan v. McClanahan, XXXX-XXXX (La.App. 4 Cir. 11/12/03), 861 So.2d 250, where one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the reviewing court should make its own independent de novo review and assessment of the record.
The issue in these two claims hinges on the interpretation of the two employment contracts. The trial court based its rulings on findings of fact. While the interpretation of Mr. Kirkland's contract was more fact intensive, the interpretation of Mr. Damrill's contract required a legal finding, because it was very specific as to the conditions upon which the bonus would be awarded.
In Cook v. Hibernia Nat. Bank, XXXX-XXXX (La.App. 4 Cir. 3/15/02), 847 So.2d 617, we held the interpretation of a contract is the determination of the common intent of the parties. LSA-C.C. art .2045. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties intent. LSA-C.C. art.2046. The words of a contract must be given their generally prevailing meaning. LSA-C.C. art.2047.

Damrill's Claim
As stated above, the payment of Mr. Damrill's bonus package was conditioned upon the objectives developed by you and your manager and that performance has been satisfactory. While Iminorities offer letter of July 28, 2000, uses the *173 phrase your manager, it does not identify the individual. However, it does state in the preceding paragraph that Mr. Damrill will report to John Isett, Chief Technology Officer.
La. C.C. article 2056 states:
In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text.
* * *
Likewise, La. C.C. article 2057 states:
In case of doubt that cannot be otherwise resolved, a contract must be interpreted against the obligee and in favor of the obligor of a particular obligation.
Yet, if the doubt arises from lack of a necessary explanation that one party should have given, or from negligence or fault of one party, the contract must be interpreted in a manner favorable to the other party whether obligee or obligor.
[Emphasis added.]
Because Iminorities drafted the contract, it cannot take advantage of its failure to provide the necessary explanation as to who the manager would be. We find the language that Damrill would report to John Isett, Chief Technology officer to be clear and unambiguous. Literal application of the language does not lead to absurd consequences. Therefore, we construe this provision in favor of Mr. Damrill, finding Dr. Isett to be the manager referenced in the Offer Letter contract.
A college degree was not a prerequisite for the job or the bonus. Although, Mr. Cook testified that he immediately found problems with the website and had to hire consultants to fix the problems, we cannot characterize his testimony as establishing unsatisfactory performance. Moreover, according to the contract, it was Dr. Isetts evaluation that was determinative of the bonus, not Mr. Cook's.
Because it is undisputed that Dr. Isett deemed Mr. Damrill to have fulfilled the objectives developed and that plaintiffs performance was satisfactory, it was legal error to find that Iminorities did not owe Mr. Damrill his bonus. Therefore, we find the trial court committed legal error in failing to award Mr. Damrill his bonus for the year 2000 according to the terms in the Offer Letter of July 28, 2000. We award Mr. Damrill Four Thousand Nine Hundred and Forty dollars ($4,940.00). This sum is calculated by taking twenty percent (20) of Mr. Damrill's annual salary of sixty five thousand ($65,000.00) dollars, which equals thirteen thousand ($13,000.00) dollars. We then took thirty-eight (38) percent of the thirteen thousand dollars because that was the percentage of time Mr. Damrill worked for Iminorities in 2000.[2] The result is four thousand nine hundred and forty ($4,940.00) dollars.

Kirkland's Claim
Iminorities' termination letter to Mr. Kirkland stated that he was terminated for cause. Iminorities asserted Mr. Kirkland's "repeated failure to perform the material duties of [his] job in accordance with the company's policies and standards" as the basis for dismissal.
To support its "cause" for termination, Iminorities presented a Business Plan, an Employee Handbook, and an Investor Rights Agreement. Mr. Kirkland stated *174 that he was not aware that the Employee Handbook was ever issued, and that he never had a copy of the Investor Rights Agreement and never saw the Business Plan. The Business Plan he likened to a prospectus, and its introductory section stated it is "furnished solely for confidential use to assist accredited investors in assessing their interest in an equity investment in Iminorities.com, Inc. (the "Company") and for no other purpose." Moreover, the Business Plan was published within the meaning of the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995.
The trial court made a factual finding, denying Mr. Kirkland his severance pay. The Reasons for Judgment stated:
This court finds that Mr. Kirkland was terminated for cause, and specifically that he did not meet the sales goals outlined for him nor did he increase the sales productivity of the company by providing the necessary ongoing sales training for his team. This Court finds that by December 2000, it was clear that Mr. Kirkland was beginning to receive communications through email that the company was not pleased with the direction of the sales department. Further, this court finds that in the following months the communications by email expressed that defendant was not pleased with Mr. Kirkland's performance.
Since there is some, albeit sparse, evidence in the record for this finding, we cannot reverse such a finding even though we may have concluded otherwise if we had been the trier of fact.
According to Mr. Kirkland's contract, the conditions for receiving his bonus were "developing the sales infrastructure and achieving the annual revenue goal." As concerns receiving his bonus, Mr. Kirkland took the position that no one set an annual revenue goal for him, therefore, Iminorities cannot claim that he did not achieve the goal for the time he was employed.
The trial court found as a fact that Mr. Kirkland did not achieve the annual revenue goals. It found Mr. Kirkland's statements to be untenable because as Vice President of Sales for Iminorities, he had the responsibility to establish annual revenue goals. Even though another fact finder could have reasonably arrived at a different conclusion, because there is evidence in the record supporting this factual finding, we cannot reverse it.
After Mr. Kirkland had signed his June 27, 2000 contract letter granting him 100,000 shares of stock and after he was employed by Iminorities, Mr. Kirkland signed another contract with Iminorities that granted him stock options. These stock options are of no value because Iminorities fired plaintiff prior to the time the rights vested in September of 2001.[3] The trial court found his signature to the stock option contract to supercede his employment contract. We disagree.
As we noted supra, La. C.C. art.2046, concerning the interpretation of contracts, says:
When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent.
Here, the record is clear that Mr. Kirkland found objectionable the fact that after being enticed to accept the position Iminorities was changing the terms. At a mandatory *175 meeting with and under pressure from Messrs. Edwards, Sr., Kataria and Porter, he signed the stock options contract. This illustrates that his intent was vitiated as to the stock options only, but not his intent to own the stock. Mr. Kirkland never signed a waiver or a renunciation of the prior contract letter dated June 27, 2000, which gave him ownership of 100,000 shares of stock. Neither does granting Mr. Kirkland ownership of the shares lead to an absurd consequence.
Therefore, the trial court committed legal error in not awarding Mr. Kirkland forty-five thousand ($45,000.00) dollars, which is the value of his 100,000 shares of Iminorities stock valued at forty-five cents ($0.45) per share, as specified in the June 27, 2000 contract letter.
Mr. Kirkland seeks reimbursement of expenses he incurred to consult with Mr. Manny Fernandez, a member of Iminorities Board of Directors. Mr. Kirkland visited Mr. Fernandez to discuss concerns he had about the management of the company. The trial court reasoned that Mr. Kirkland did not follow all the rules of the Employee Handbook in verifying this expense with another officer in the company, Mr. Kataria.
Iminorities allegedly delegated the responsibility of establishing and achieving annual revenue goals to Mr. Kirkland. Mr. Kirkland, in an effort to address internal company problems, sought to discuss problems he encountered in achieving those goals with Mr. Fernandez. Nevertheless, defendant now argues that Mr. Kirkland did not have the authority to meet with a member of the board to discuss the company's direction. However, Mr. Kirkland had express permission from the C.E.O. to take this trip. Mr. Kirkland produced an email with the subject line reading: "RE: Kirkland Request for Meeting with Manny Fernandez" sent to the C.E.O., to which the Chief Executive Officer/Chairman Preston Edwards, Sr. replied:
You can talk to Manny whenever you want and you can meet with him whenever you want....
This language is unequivocal. Iminorities cannot reasonably maintain that express authority from the company's C.E.O. to its Vice President of Sales is not sufficient to authorize a trip to visit a board member. It was manifest error not to award Mr. Kirkland reimbursement to consult with Mr. Fernandez who was on Iminorities' Executive Board. Therefore we award Mr. Kirkland nine hundred sixty-three dollars and sixty-six cents ($963.66) for travel reimbursement, which includes fifty ($50) dollars for auto rental, twenty-four ($24) dollars for taxi/tolls/parking, seven hundred and nineteen ($719) dollars for airfare, eighteen ($18) dollars for meals, thirteen ($13.66) dollars and sixty-six cents for mileage expenses and the late fees incurred on his American Express credit card.
In summary, we reverse the Judgment below insofar as it denied Mr. Damrill's bonus for the fiscal year 2000, and render Judgment in his favor in the amount of Four Thousand Nine Hundred Forty and no/100 ($4,940.00) Dollars. Likewise we reverse the Judgment below insofar as it denied Mr. Kirkland his one hundred thousand shares and travel reimbursement to see Iminorities Board Member Fernandez. We render Judgment in his favor in the amount of $45,000.00 for his stock (100,000 shares of Iminorities valued at $0.45 per share) and in the amount of $963.66 for travel reimbursement. We affirm all other parts of the Judgment.
REVERSED IN PART; AFFIRMED IN PART.
NOTES
[1] The rate at which a company in financial trouble exhausts its cash required to maintain solvency.
[2] That figure was calculated by taking the number of days worked in 2000, beginning with August 15, 2000 through December 31, 2000, which equals 139 days divided by 365 days in the year, equalling 38%.
[3] A condition of the stock options was that plaintiff be employed by the company to vest on a certain date.